**SIGNED.**



**Dated: December 04, 2008**

_____
**JAMES M. MARLAR
U.S. Bankruptcy Judge**
_____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>**BERRY GOOD, LLC**, and related proceedings,<br><br>                             Debtors.<br><br>OTHER JOINTLY ADMINISTERED DEBTORS:<br><br>**BEAUDRY CHEVROLET, CHRYSLER, JEEP & DODGE, LLC**<br>4:08-bk-16504-JMM<br><br>**PALO VERDE VENTURES, LLC**<br>4:08-bk-16526-JMM<br><br>**GILA RIVER VENTURES, LLC**<br>4:08-bk-16527-JMM<br><br>**SMART VENTURES, LLC**<br>4:08-bk-16529-JMM<br><br>**WITT VENTURES, LLC**<br>4:08-bk-16531-JMM<br><br>**BEAUDRY RV COMPANY**<br>4:08-bk-16533-JMM<br><br>**BEAUDRY RV RESORT, INC.**<br>4:08-bk-16536-JMM | Chapter 11<br><br>No. 4:08-bk-16500-JMM<br>(Jointly Administered)<br><br>**MEMORANDUM DECISION** |

## **PROCEDURE**

The jointly administered Debtors filed their respective cases between November 17 and 25, 2008.[1] On November 21, 2008, this court entered an order, approved by the Debtors and certain creditors, which allowed the Debtors to borrow up to $750,000 on an interim basis (Dkt. #29 relating back to Dkt. #8). This "DIP financing" request was interim in nature, anticipated to last no longer than 45 days. Eventually, the Debtors hope to repay the DIP lender, GE Commercial Distribution Finance Corporation ("GE" or "Lender") from the proceeds of a longer term DIP loan. That latter matter is set for hearing on December 18, 2008.

The order approved on November 21, 2008 (Dkt. #29) left open for decision any disputes concerning the Debtors' use of the financing proceeds, and whether any line items in their proposed budget were controversial. In such event, the court agreed to hear evidence, and to decide the propriety of any disputed line item in the Debtors' budget.

As matters developed, two disputed items were identified, and became the subject of the court hearing held on December 3, 2008. Those disputed items were:

1. Whether the Debtors could pay (within the next 45 days) $288,000 to GE, on its pre-petition secured debt, from the proceeds of the post-petition loan; and

2. Whether the Debtors should pay up to $210,000 (over the next 45 days), for "corporate administrative expenses."

(*See* Ex. "1" to hearing of December 3, 2008.)

The 45-day period of the interim DIP financing ends on January 5, 2009.

---

[1] Berry Good, LLC, Case 4-08-bk-16500 filed November 17, 2008; Beaudry Chevrolet, Chrysler, Jeep & Dodge, LLC, Case 4:08-bk-16504 filed November 17, 2008; Palo Verde Ventures, LLC, Case 4:08-bk-16526 filed November 18, 2008; Gila River Ventures, LLC, Case 4:08-bk-16527 filed November 18, 2008; Smart Ventures, LLC, Case 4:08-bk-16529 filed November 18, 2008; Witt Ventures, LLC, Case 4:08-bk-16531 filed November 18, 2008; Beaudry RV Company, Case 4:08-bk-16533 filed November 18, 2008; and Beaudry RV Resort, Inc., Case 4:08-bk-16536 filed November 18, 2008. Beaudry RV Mesa, Inc. Case 4-08-bk-17015 filed November 25, 2008, and its motion to be jointly administered with the foregoing Debtors is currently set for hearing on December 15, 2008.

## ISSUES AND DISCUSSION

**A.     May the DIP financing be used to pay pre-petition debt?**

From the $750,000 sought to be borrowed by the Debtors in the 45-day interim period, they propose to pay the DIP Lender (GE) the sum of $288,000 on account of a pre-petition secured obligation. The Debtors' business purpose is to maintain and continue their existing, pre-petition flooring line of credit. The Debtors believe that such a decision is critical to the Debtors' abilities to reorganize, and to retain this line of credit into their post-confirmation future. They argue that using the post-petition financing in this manner is a proper exercise of the Debtors' business judgment.

On the other hand, the creditors argue that the proposed use of $288,000 is in violation of fundamental bankruptcy principles which restrict payment of pre-petition debt, absent a confirmed reorganization plan.

On this record, GE is an oversecured pre-petition secured creditor with a blanket lien on much, if not all, of the Debtors' inventory, equipment and general intangibles. However, the payment to be made to it is not from "products" or "proceeds" of its collateral.

Basic to bankruptcy jurisprudence is the statutory principle that a pre-petition security interest does not attach to property acquired post-petition. 11 U.S.C. § 552(a). In addition, in the context of a reorganization proceeding, pre-petition debt may not be paid in the absence of a confirmed reorganization plan.

The exception to the first of the foregoing principles is found in the statute, § 552(b), and it relates only to secured creditors. That statute provides that proceeds or profits from an "ordinary course" sale, use or lease of secured property, which occurs after the date of filing, are also subject to the secured creditor's security interest, and that such proceeds may not be used by the debtor, in ongoing operations, in the absence of such creditor's consent or the protection of the creditor through some form of adequate protection. 11 U.S.C. § 363(c)(1) - (3).

Here, the court approved a $750,000 DIP credit facility in order that the Debtors could pay pre-petition wages, which was intended to retain the employee cadre, because payment of those sums would be of a priority nature in any event. 11 U.S.C. § 507(a)(4). In addition, and importantly, no party contested the ongoing need for such employees, or the use of DIP loan funds for such purpose. Any excess was to be used in ongoing operations.

However, the objection to the current request is based upon the Debtors' desire to pay $288,000 back to the same DIP lender from whom they had an approved borrowing request of up to $750,000 post-petition. This $288,000 would then be applied by the post-petition Lender to the Debtors' pre-petition debt owed to GE. The same post-petition Lender, GE, though, has received a <u>post-petition</u> junior lien on the Debtors' real property to secure repayment, as an <u>administrative</u> expense, for the $750,000 lent to the DIP. If this line-item payment on the pre-petition debt is authorized, then the pre-petition Lender will thereby improve its pre-petition position by $288,000, at the expense of other estate creditors. And, it still gets repaid up to the full $750,000 as a secured administrative expense should the Debtors default. Thus, $288,000 of the post-petition cash, otherwise unrestricted, is effectively earmarked for the same Lender for payment on its pre-petition debt. "The entire purpose of the DIP financing is to preserve the going concern value of the Debtors, such that there will be money in the future available to the Debtors." *In re DJK Residential, LLC*, 2008 WL 650389 (S.D.N.Y. March 7, 2008). This use essentially puts the Debtors in a strait jacket, and leaves them with very little operational funds.

In the instant case, GE has not argued, from evidence on this record, that its pre-petition obligation is undersecured, nor has it sought stay relief, nor opposed use of at least some portion of the proceeds from any post-petition sale of its collateral.[2]

The Debtors maintain that payment on the GE revolving line of credit is in the "ordinary course of business" for their businesses. While certainly that term, as used by the Debtors, is accurate as to their <u>pre-petition</u> relationship, that term has a different legal meaning in a bankruptcy context. In bankruptcy proceedings, the term "ordinary course of business" is used

---

[2] GE's counsel inferred that such might be the case, in argument at the conclusion of the December 3, 2008 hearing, but nothing in the evidentiary record, to date, supports this claim.

statutorily to refer to the use, sale or lease of <u>estate property</u> as being either "in" or outside of "the ordinary course of business." *See, e.g.,* 11 U.S.C. § 363(c)(1). Or, in the case of attempted preference recoveries, <u>pre-petition</u> payments made in the "ordinary course" of the business or financial affairs of a debtor and the transferee may be a defense to a voidable preference. *See, e.g.,* § 547(c)(2).

But no other statutory authority allows a debtor, in a chapter 11 proceeding, to make payments on pre-petition debt as an "ordinary course" transaction. Just as the automatic stay of § 362(a) prohibits creditors from collecting on pre-petition obligations, fundamental bankruptcy basics only allow distribution of a debtor's estate (§ 541(a)) according to § 726 (chapter 7 liquidation priorities), or in accordance with confirmed reorganization plans (as in chapters 11 or 13). In this manner, there is both order and organization associated with the distribution process:

> Although the debtor in possession or trustee may use property of the estate in the ordinary course of business, it does not have the right to pay prepetition claims, which would violate the Code's policy of equal treatment of similarly situated creditors. Generally, payment of such claims must await confirmation of the plan.

Hon. Joan N. Feeney, *Bankruptcy Law Manual* § 11A:25 (Thomson/West 2008).

Thus, the court must disagree with the Debtors that payment of this pre-petition interest debt is in the "ordinary course." While that characterization would be accurate if there was no bankruptcy, the bankruptcy filing institutes a set of new rules. All other creditors do not have the same luxury, as they must await a plan confirmation before receiving payments. There is no persuasive reason that GE's pre-petition debt needs to be paid in a different manner, and the authorities do not support the notion. This is doubly true since GE has received new collateral for its post-petition loan.

The well-established purposes of a business reorganization under chapter 11 are "to initially relieve the debtor of its prepetition debts, to free cash flow to meet current operating expenses, and ultimately to permit the debtor 'to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.'" *In re American Mariner Indus., Inc.*, 734 F.2d 426, 431 (9th Cir. 1984 (citations omitted). In order to fulfill these goals, the Bankruptcy Code provides a systematic approach to

settling or reorganizing a company's pre-petition financial obligations by placing the assets under the supervision of the bankruptcy court, creating a new debtor entity and providing rules of priority and payment under a plan of reorganization. In this scheme, pre-petition secured creditors are given the benefit of their bargain and various protections, such as adequate protection of their secured interest. *Id.*

The Code does not expressly authorize courts to allow preferential payment of pre-petition obligations in contravention of its claims priority scheme or outside of a confirmed plan of reorganization. *In re B&W Enters., Inc.*, 713 F.2d 534, 537 (9th Cir. 1983) (deeming it "unwise to tamper with the statutory priority scheme devised by Congress" . . . "absent compelling reasons"); *see also In re Hines*, 147 F.3d 1185, 1191 (9th Cir. 1998) (what is essentially a "doctrine of necessity" is implemented when "the entire system would suffer a massive breakdown"); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex 2003) (debtor in precarious position).

A pre-petition creditor's continued business with the debtor-in-possession is often the stimulus for seeking payment of one creditor's prepetition debt over the others under a "doctrine of necessity" or "critical vendor" theory. These terms are not defined in the Bankruptcy Code. *In re Brown & Cole Stores, LLC*, 375 B.R. 873, 875 n.3 (9th Cir. BAP 2007) (citing *The Future of the Doctrine of Necessity and Critical-Vendor Payments in Chapter 11 Cases,* 47 B.C. L. Rev. 183, 205 (Dec. 2005)). Indeed, most circuit courts, including the Ninth, have held that the bankruptcy court does not have general equitable power under § 105(a) to overrule the Code's priority scheme by favoring one class of unsecured creditors over another. *See B&W Enters.*, 713 F.2d at 537; *In re KMart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004); *In re Oxford Mgmt. Inc.*, 4 F.3d 1329, 1333-34 (5th Cir. 1993); *Official Committee of Equity Security Holders v. Mabey*, 832 F.2d 299 (4th Cir. 1987). If unsecured creditors cannot be paid, there is no reason to pay an oversecured creditor from post-petition assets.

Even those courts that would allow such payments, under § 105(a), or under other code sections, such as a § 363 use of estate funds outside the ordinary course, demand a stringent evidentiary test showing that the payment of the pre-petition claims is "critical to the debtor's reorganization." *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999). For example, in

*KMart,* the Seventh Circuit opinion discussed a requirement, for any critical vendor order, that there be evidence of a "prospect of benefit to the other [noncritical, disfavored] creditors." *KMart*, 359 F.3d at 874. One bankruptcy court authorized critical vendor payments where the vendors were unique and it would take the debtor four to six weeks to replace them. *See In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15 (Bankr. M.D. Fla. 2005). Texas bankruptcy courts apply a three-part test:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*In re CoServ, L.L.C.*, 273 B.R. 487, 498 (Bankr. N.D. Tex. 2002).

On the record before the court, the disadvantages outweigh the advantages. The lack of long-term benefit, while certainly debatable, was not carried by a preponderance of the evidence. If the non-payment of $288,000, out of the $350,000 advanced, causes the business to collapse, the prospects for eventual reorganization would appear to be weak.

The date of filing is the Rubicon. Once crossed, liens are cut off (except for proceeds), in order that new loans, on new terms, can be arranged under § 364. Here, GE agreed to lend new money on the basis of new liens being granted it on the Debtors' other post-petition or valuable property, and payment back to itself on a pre-petition debt was never a part of the bargain. (*See* November 21, 2008 order at Dkt. #29.)

A clean line must be drawn between pre- and post-petition debt, and it is unlawful to blur those lines, except in rare and exceptional circumstances, such as with the wage claimants.

Debtors in possession generally enjoy little negotiating power with a proposed lender, particularly when the lender has a pre-petition lien on cash collateral and other assets. As a result, lenders often exact terms that are favorable to them, but that harm the estate and all other creditors. *See In re Ames Department Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y.1990); *In re Tenney Village Co.*, 104 B.R. 562, 567-570 (Bankr. D.N.H. 1989). While certain favorable financing terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do

not allow terms in financing arrangements which convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender. *Id.* Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors, thereby leveraging the chapter 11 process by granting a lender excessive control over the debtor or its assets to the prejudice of other parties in interest. *Id.* The bankruptcy court cannot, under the guise of § 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements. *See In re Chevy Devco*, 78 B.R. 585, 589-90 (Bankr. C.D.Cal. 1987).

The Debtors submitted documentary and testimonial evidence. Mr. Robert Dietrich opined on the current value of the Debtors' various real estate holdings, but offered no opinion on the necessity for allowing payment of pre-petition debt.

Mr. Conrad Plomin, the Debtors' investment banker, described the general nature of the Debtors' financial lines of credit, and provided a brief history of how those lines developed. Mr. Plomin noted that he had contacted between 10 and 15 brokers or other lenders, but that only GE had agreed to lend money to the Debtors, post-petition. Asked on cross-examination whether the Debtors had received any new units post-petition, Mr. Plomin responded, "I personally do not have direct knowledge."

Ms. Amanda Hirchert, a senior underwriter with GE, is knowledgeable with regard to the Debtors' existing credit relationship with GE. She testified that, although the Debtors were "out of trust" about $300,000 (meaning the Debtors had sold secured inventory but had not yet remitted agreed sums), that this situation was within tolerable limits, and should rectify itself over time. She also observed that GE felt the Debtors to be well-positioned within the RV industry, and that GE consigns units from other dealers to the Debtors' lots, and does so because of the Debtors' professional competence and reputation.

However, Ms. Hirchert stated that GE would only continue its revolving flooring arrangements if the Debtors "remained current." This meant that a portion of the newly-lent money,

Case 4:08-bk-16500-JMM    Doc 52    Filed 12/04/08    Entered 12/04/08 16:09:25    Desc
Main Document    Page 8 of 11

in the sum of $288,000, had to be paid, or GE would advance no further monies under the approved DIP facility. So far, GE has advanced $350,000 of the $750,000 approved by the court, secured by a lien on the Debtors' real estate assets.

Ms. Hirchert stated that, unless the $288,000 is paid on its pre-petition debt, to keep its pre-petition obligations "current," GE will not lend further.[3]

The Debtors' last witness was David LaPorte, the Debtors' comptroller. Mr. LaPorte testified that the interim DIP loan of $750,000 was necessary for continued operations, but acknowledged that if the proposed payment of $288,000 was not authorized by the court, that those sums would remain in the Debtors' coffers for use in the ongoing business. However, he then stated that without such approval (i.e., payment on GE's pre-petition debt), the Debtors "would fold."

This court's order of November 21, 2008 was clear. No mention was made, at the time of its approval of the $750,000 DIP facility, that $288,000 of the first $350,000 draw was to be used for payment of a single creditor's pre-petition debt. It is not appropriate to do so in the absence of a confirmed plan.

Therefore, an order will be entered which expressly disallows the use of any post-petition loan proceeds to be paid on or to the benefit of any pre-petition debt, except wages as previously ordered. The objection to this line item of the Debtors' proposed budget will be sustained.

**B.     May the DIP financing be used to pay post-petition corporate administrative expenses, including officer and insider salaries?**

While officer and insider salaries were objected to as being unreasonable or excessive, no controverting evidence was presented, either directly or through cross-examination, which

---

[3] GE should be aware that this court's order granted it real property liens based upon GE's promise to allow a $750,000 DIP line of credit. Should GE advance no further sums, such may be considered a breach of contract, resulting in a DIP damage claim of at least $400,000. That sum could then be paid by a set off and removal of the real estate liens, leaving a $50,000 monetary judgment against GE.

1 suggested that lesser amounts would be more appropriate. Nor was evidence presented that showed
2 that such employees were not needed. Thus, for now, the court accepts, on this record, the Debtors'
3 business judgment as to the need for such employees, and as to the reasonableness of their salaries.
4 The objection to those post-petition salaries will be overruled. Thus, the Debtors may continue to
5 pay such executive or insider salaries.

DATED AND SIGNED ABOVE.

COPIES served as indicated below on the date
signed above:

Michael McGrath and Frederick J. Peterson
Mesch, Clark & Rothschild, P.C.
259 N. Meyer Ave.
Tucson, AZ 85701
Attorneys for Debtors                            Email: ecfbk@mcrazlaw.com

Susan G. Boswell
Quarles & Brady LLP
One S. Church Ave., Suite 1700
Tucson, AZ 85701-1621
Attorneys for Bank of America, Comerica
  Bank, and Wells Fargo Bank              Email: sboswell@quarles.com

Scott D. Gibson and Kristen M. Green
Gibson, Nakamura, & Decker, PLLC
2941 N. Swan Rd., Suite 101
Tucson, AZ 85712-2343                   Email: sgibson@gnglaw.com
Co-counsel for GE Commercial Distribution     Email: kgreen@gnglaw.com

Philip R. Rudd
Kutak Rock LLP
8601 N. Scottsdale Rd., Suite 300
Scottsdale, AZ 85253-2742
Co-counsel for GE Commercial Distribution     Email: philip.rudd@kutakrock.com

Terri A. Roberts and German Yusufov
Deputy County Attorneys
32 North Stone Avenue, Suite 2100
Tucson, AZ 85701                         Email: terri.roberts@pcao.pima.gov
Attorneys for Creditor Pima County, Arizona    Email: german.yusufov@pcao.pima.gov

John R. Clemency
Greenberg Traurig LLP
2375 E. Camelback Rd., Suite 700
Phoenix, AZ 85016-9000
Attorneys for Wells Fargo Bank. N.A.          Email: clemencyj@gtlaw.com

Larry Lee Watson and Edward K. Bernatavicius
Office of the U.S. Trustee
230 N. First Ave., Suite 204                 Email: larry.watson@usdoj.gov
Phoenix, AZ 85003-1706                    Email: edward.k.bernatavicius@usdoj.gov


By /s/ M.B. Thompson
      Judicial Assistant